UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| MICHAEL HARTT, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br><br>FIFTH THIRD BANCORP.,<br><br>        Defendants. | **JURY TRIAL DEMANDED**<br><br>Case No. _____<br><br><br><br>**COMPLAINT** |

Plaintiff Michael Hartt, on behalf of himself and all others similarly situated nationwide, brings this Class Action Complaint against Defendant Fifth Third Bancorp.   Plaintiff states the following based on information and belief and investigation of counsel:

## I. INTRODUCTION

1.      Fifth Third Bancorp ("Fifth Third" or "the Bank") claims to be a bank that for more than 160 years has "done well by doing good[1]" with a legacy of caring about its customers that extends to the present day. However, nothing could be further from the truth. Since at least 2008, the Bank has achieved its record-setting income and shareholder value at the expense of its customers by engaging in an ongoing pattern of deception and fraud.  Specifically, as a result of a toxic, high-pressure sales environment, Fifth Third employees: (1) opened bank accounts in customers' names without customer approval; (2) applied for credit cards in customers' names without their knowledge; (3) enrolled customers in payday loan and online banking services that

---

[1] 2019 Annual Report Dear Shareholders letter https://ir.53.com/sites/53-e.investorhq.businesswire.com/files/report/additional/FITB_2019_10-K.pdf

they did not request; (4) charged customers fees on accounts that the customer had never applied for or approved; and (5) transferred funds from customers' authorized existing accounts to new, fraudulently opened accounts. The opening of unauthorized accounts is hereafter collectively referred to as the "Unauthorized Account Fraud," and any consumers subjected to such activity are hereinafter referred to as "Affected Consumers."

2.      The toxic high-pressure sales environment that culminated in the Unauthorized Account Fraud was the direct result of Fifth Third's "cross-selling" sales strategy.  Cross-selling was Fifth Third's scheme to grow Bank revenue by requiring employees to sell increasing numbers of products to each customer.

3.      Fifth Third made the pursuit of cross-selling paramount by, among other things, conditioning employee performance evaluations, promotion, and compensation decisions—and even continued employment—on whether managers, tellers, and other employees met increasingly aggressive sales goals.  Fifth Third's sales goals became so high that employees could not achieve them through legal or ethical means.

4.       As a result, Fifth Third's relentless pressure to meet unrealistic cross-selling goals caused countless Fifth Third employees in branches across ten states to participate in the Unauthorized Account Fraud. To carry out the fraud, employees accessed and used customers' personal information without approval, forged signatures, misappropriated funds from customer accounts without authorization, and took other actions damaging to consumers' credit in order to maintain the favor of their superiors and enrich Fifth Third and its high-level executives.

5.      The "sales" generated by the Unauthorized Account Fraud were important to the Bank's bottom line.  The success of Fifth Third's branch banking division enabled the Bank to

generate strong profits, including $2.2 billion in net income in 2019.[2]  It also enriched Fifth

Third's executives: Greg Carmichael, Fifth Third's CEO, is one of the highest paid executives in

the banking industry, making $11.2 million in 2018[3].  That same year, Fifth Third's other top

executives, including Timothy Spence, Executive Vice President and Head of Consumer Bank,

Payments and Strategy earned $3.04 million, and Frank R. Forest, Executive Vice President and

Chief Risk Officer earned $2.89 million.[4]

      6.     Fifth Third senior management knew for a long time that Fifth Third's cross-sell

success and growth resulted from the Unauthorized Account Fraud.  By 2008, the Bank and its

senior management knew that its employees were opening credit accounts in customers' names

without customer consent because senior management had received a significant number of

whistleblower complaints reporting employees for doing so.  In addition, the Bank has conceded

that, between 2010 and 2016, Bank employees opened 1,100 Unauthorized Accounts.

      7.     The Unauthorized Account Fraud was able to flourish because while the Bank's

employees were carrying out the fraud to meet sales and revenue goals, Fifth Third was

misrepresenting the Bank's activities to consumers. Between 2008 and the present (hereinafter

the "Relevant Time"), the Bank and its executives issued statements assuring the public that

Fifth Third had adopted policies and procedures to protect the safety and integrity of customers'

financial information, and a robust risk management program. All these representations were

false.

---

[2] 2019 10K https://ir.53.com/sites/53-
e.investorhq.businesswire.com/files/report/additional/FITB_2019_10-K.pdf
[3] https://www.americanbanker.com/list/which-bank-ceos-received-the-biggest-raises-in-2018
[4] Fifth Third 2020 Proxy Statement at p.65, https://ir.53.com/sites/53-
e.investorhq.businesswire.com/files/report/additional/FITB_Proxy_Statement.pdf

8.     The opening of each unauthorized account harmed Plaintiff and the Class in at least four ways. First, Class members were charged fees and other costs on accounts opened without their consent.  Second, class members' credit scores were negatively impacted as a result of unauthorized credit inquiries and unpaid fees on accounts they knew nothing about.  Third, the diminution in consumer credit scores in turn negatively affected class members' job applications, loans for automobiles, and mortgage applications.  And fourth, class members' right to exclusive control of their own personal financial data was usurped by the Bank when it accessed their credit reports, and account data in order to open the Unauthorized Accounts. But for Fifth Third's Unauthorized Account Fraud, consumers would not have paid fees for products they never wanted, had derogatory information added to their credit report, suffered the consequences of reduced credit scores caused by such information, and had their right to control their own financial information stolen.

9.     The fact that Fifth Third had engaged in the Unauthorized Account Fraud was first brought to light on March 9, 2020 when the Consumer Financial Protection Bureau (CFPB) filed a complaint[5] (the CFPB Complaint) against the Bank.[6]

10.    The day the CFPB Complaint was filed, Fifth Third issued a statement rejecting CFPB's allegations of widespread misconduct, calling them "unsubstantiated."  However, the

---

[5] The CFPB complaint and investigation may only scratch at the surface of the fake account scandal at Fifth Third because that agency and others responsible for oversight of the Bank's activities have inherent biases in the Bank's favor. This is because Leonard Chanin, the acting deputy director of the CFPB served as Deputy General counsel and senior vice President at Fifth Third until 2017.   Chanin was employed by the Bank during the CFPB's three year investigation of the Bank, and took no action to identify or redress the thousands of unauthorized accounts that were opened by Bank employees, even though, according to the Bank's own account, the existence of Unauthorized Accounts was known to the Bank.
[6] *Bureau of Consumer Financial Protection v. Fifth Third Bank, N.A.*, 20-cv-01683, ("CFPB Complaint") at ¶ 5.

Bank did concede that approximately 1100 unauthorized accounts were opened between 2010 and 2016.  But the Bank said it had resolved the issue "on its own years ago, by waiving or reimbursing any improper charges to affected customers.[7]

11.     Fifth Third's defense is simply a lie.  Statements by numerous current and former Fifth Third employees, employed at different Fifth Third branches, in different states, corroborate that the Bank's aggressive sales goals forced employees to game the system and engage in illegal activity such as opening unauthorized accounts in order to keep their jobs. These employees also report that Fifth Third management knew and condoned this activity. Even if Fifth Third had reimbursed all Affected Consumers for fees associated with Unauthorized Accounts, this would not come close to remedying the bank's wrongdoing.

12.     Each time Fifth Third (a) accessed or used customer's personal information without permission; (b) opened a bank or credit account without authorization; (c) withdrew funding from customers' accounts to fund unauthorized accounts; (d) charged consumers fees or expenses stemming from the unauthorized accounts; and (e) reported anything related to the unauthorized accounts to credit reporting agencies Fifth Third engaged in unfair and deceptive practices.

13.     Likewise, each time the Bank or its executives made deceptive or false statements to customers and the public, among other things, that: (a) misrepresented the Bank's sales practices; (b) misrepresented the way Fifth Third handled and safeguarded its customers' personal information; (c) misrepresented the Bank's risk management programs the Bank also engaged in unfair and deceptive practices.

---

[7] https://www.53.com/content/dam/fifth-third/docs/legal/2020/Fifth_Third_Fact_Sheet.pdf

14.     Given the evidence that Fifth Third has engaged in a consistent pattern of conduct that has harmed Plaintiff and the proposed class for its own profit, Plaintiff bring this action to hold the bank accountable for its unconscionable anti-consumer conduct and to secure other authorized relief.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d), because Plaintiff and many members of the Class are citizens of states different from Defendant's home state, there are 100 or more class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

16.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(3) because the Court has personal jurisdiction over Defendant, which has its headquarters in this district and substantial portion of the alleged wrongdoing took place in this District.

## III.     PARTIES

17.     Plaintiff Michael Hartt, is and was, at all relevant times, a resident and citizen of the State of Michigan.

18.     Defendant Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. The Bank provides commercial banking, branch banking, consumer loans and wealth and asset management services and employs approximately 20,000 people across the ten states in which the bank operates: Ohio, Illinois, Florida, Georgia, Indiana, Kentucky, Michigan, North Carolina, Tennessee, and West Virginia.[8]

---

[8] https://ir.53.com/press-release/earnings/fifth-third-announces-fourth-quarter-2019-results

As of December 31, 2019, the Company had $169 billion in assets and operated 1,149 full-service Banking Centers, and 2,400 ATMs.

## IV.    FACTUAL ALLEGATIONS

19.    Fifth Third describes itself as operating four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. However, just two of those units—commercial banking and branch banking—are responsible for the lion's share of the Bank's business and generate more than ninety percent of the Bank's revenue.[9]  In 2019, Fifth Third's branch banking unit, which includes the Bank's checking and savings accounts, credit cards and lines of credit business, generated $3 billion in revenue, which was approximately a third of its total income.  The success of Fifth Third's branch banking unit outpaced its competitors, generating peer leading household and deposit growth.[10]

**Fifth Third's Cross Sell Strategy Pressured Employees to Engage in Unethical Sales Practices**

20.    In its effort to maximize growth, Fifth Third built its branch banking business on a cross selling strategy combined with a sales culture designed to encourage sales at all costs. Executives and Bank supervisors put enormous pressure on employees to convince customers to open multiple fee-charging accounts. In an effort to meet growth goals otherwise unattainable by reasonable and lawful means, senior management instead forces branch management and employees to meet higher and higher sales goals regardless of whether or not consumers are interested in cross sold accounts.

---

[9] https://ir.53.com/sites/53-e.investorhq.businesswire.com/files/report/additional/FITB_2019_10-K.pdf at p. 63.
[10] Fifth Third 2019 Annual Report at p.12.

21.     Fifth Third's coercive strategy is to structure its employee evaluations based on a point structure.  Each employee is evaluated on how many points they achieve a month, and failure to achieve goals established for the employee can lead to adverse action against the employee, up to and including termination of employment.

22.     Points are awarded based on sales: for example, a customer opening a checking account accrued five points.  Sales of credit cards, enrollment in online services and in the Bank's payday loan product also generated a set number of points.

23.     Sales goals imposed on employees were so high as to be impossible to achieve. For example, one Fifth Third branch employee assigned a goal of seven hundred points per month, a number assigned to at least one Fifth Third employee, would require that employee to sell 140 products a month,[11] 35 products a day, or 4-5 products an hour.

24.     Current and former Fifth Third branch employees describe Fifth Third's ethos as requiring them to sell products by any means necessary, to the detriment of the consumer. Numerous former employees called sales goals "unattainable"  One employee characterized the culture under current management as designed to ensure executives achieved their bonuses. Salespeople were pitted against one and other to meet sales goals.  Employees were required to spend entire days upselling products to existing customers.[12]

25.     The fact that employment with Fifth Third is premised on meeting its outrageous sales goals is supported by the Bank's high rate of employee turnover, which has been called "disastrous" and been pegged as high as 75% by former employees familiar with the revolving

---

[11] https://www.indeed.com/cmp/Fifth-Third-Bank/reviews?ftopic=mgmt&start=20
[12] https://www.indeed.com/cmp/Fifth-Third-Bank/reviews

door and burnout associated with attempting to meet sales goals impossible to meet through legal means

26.    The Bank's relentless focus on impossible goals led it to promote and tolerate illegal practices designed to harm customers while inflating the Bank's bottom line. According to one former employee, "You will be fired if you do not meet your goal, which leads to my next point... - Employees cheat the system to meet/exceed their sales goals and are praised, not punished for being dishonest….Unethical sales practices were overlooked when those doing it were viewed as high performers. They talked a good game about doing what was right for the customer, but in the end, they only cared about sales."[13]

27.    As another former employee explained, given the amount of pressure executives put on employees to meet sales goals, it should have been no surprise that many resorted to unethical tactics.  High level management told employees to lie about competitors' products, and employees intentionally misled clients to meet goals.  As one employee stated, "the options are literally meet your goals or get written up."[14]

28.    Another employee characterized the pressure this way: "You will be under constant pressure to do questionable and unethical things to get sales. You will need to decide whether this is a risk you want to take in order to appease your manager & make your goals. If you report anyone for unethical practices, be very documented & be prepared for retaliation."

29.    Several employees compared the sales atmosphere at Fifth Third to competitor Wells Fargo Bank, where employees were found to have created thousands of unauthorized

---

[13] https://www.glassdoor.com/Reviews/Fifth-Third-sales-goals-Reviews-EI_IE1395.0,11_KH12,23.htm
[14] https://www.glassdoor.com/Reviews/Fifth-Third-sales-goals-Reviews-EI_IE1395.0,11_KH12,23.htm

accounts, as a result of a similarly unrelenting cross sell strategy. One stated, "I am truly surprised that the regulators have not caught on to this now, I hope that, for the customers' sake, that they will someday soon." Another said the Bank was Wells Fargo in the making.

## Fifth Third's Relentless Sales Pressure Culminated in the Creation of Unauthorized Accounts

### Unauthorized Demand Accounts

30. The unrelenting pressure and unethical behavior had its logical result. Fifth Third branch management would have employees open, what some referred to as "fake checking and savings accounts" to meet personal and branch sales goals.[15]

31. To open the Unauthorized Accounts, employees accessed and used Fifth Third customers' personal information without approval and forged signatures on application documents.

32. Some of these Unauthorized Accounts were "funded" by the unauthorized transfer of money from an Affected Customer's existing authorized account. Upon receiving credit for opening the fake accounts, Fifth Third employees sometimes transferred the misappropriated money back to the Affected Customer's account.

33. Another product that was part of the Unauthorized Account Fraud was online banking enrollment. From at least 2010 through 2016, Fifth Third employees signed Affected Customers up for online banking without their consent in order to earn points and other incentive compensation.

---

[15] https://www.indeed.com/cmp/Fifth-Third-Bank/reviews?ftopic=mgmt&start=60&sort=rating_asc

34.    The Unauthorized Account Fraud was so commonplace that, it was well known to management and, according to internal Fifth Third Documents, the Bank tracked the number of unauthorized accounts that were being opened by branch.  Internally the Bank called the practice "gaming."[16]

**Unauthorized Credit Accounts**

35.    In addition, the Bank's unethical sales tactics included submitting credit card applications without customer permission.  Fifth Third employees did not disclose the existence of monthly fees on the credit card accounts, but nevertheless charged customers such fees on the unauthorized accounts.[17]

36.    As early as 2008, Fifth Third was aware that its employees were opening credit cards in customers' names without consent, yet the bank took no action to stop the practice. Instead, Fifth Third continued to push employees into selling credit cards to customers as part of its incentive and employee recognition programs.

37.    The unauthorized account fraud also included Fifth Third employees signing up customers to another credit program called "Early Access" without customer knowledge or consent.  Early Access is a Fifth Third payday loan product that allowed customers to take advances against future direct deposits for a hefty ten percent fee.

38.    Fifth Third's senior management was aware of the unauthorized Early Access account enrollments because the Bank had received numerous employee complaints on an internal whistleblower hotline that Early Access accounts were being opened by fellow employees without the consent of Affected Consumers.

**Fifth Third's sales practices harmed Plaintiff and the Class**

---

[16] See Exhibit 4 to CFPB's Opposition to Fifth Third's Motion to Transfer Venue
[17] *Id.*

39. In or around January of 2020, Michael Hart received in the mail an envelope containing a Fifth Third branded credit card. The flier which accompanied the card stated that the card had a $1,500 limit.

40. Mr. Hartt was surprised to receive the card because he had not applied for a Fifth Third credit card and has no banking business with Fifth Third.

41. When Mr. Hartt received the card, he called the phone number on the flyer which accompanied the card and asked why he had received the card. The female employee he spoke with did not provide a reason. When Mr. Hartt asked why the card had a $1,500 limit, the employee informed him that was all the credit he qualified for.

42. In fact, Mr. Hartt has a long credit history and very good credit score, which would have entitled him to a much higher limit had he in fact applied for the card. Because he never authorized or applied for the account, he instructed the employee to cancel the card and close the account. After the call, Mr. Hartt immediately destroyed and disposed of the Fifth Third credit card he received.

**Negative Impact on Customers' Credit Scores**

43. Each time any credit account is opened, a credit inquiry is conducted which has a negative effect on a consumer's credit score. The impact lasts for one year. The degree of impact a credit inquiry has on consumers varies depending on the consumer's credit history. Credit inquiries have a much more significant impact on customers with limited credit histories, which typically include young people and people with fewer resources.

44. Customers with lower credit scores may be refused credit or be subject to higher interest rates to secure credit. A lower credit score can also impact an individual's employment

and housing opportunities.  By opening credit card accounts without Affected Customers'
permission, Fifth Third caused a negative effect to their credit scores.

45.     Another way Affected Customers were damaged by the Unauthorized Account
Fraud was that Fifth Third charged fees on unauthorized credit card and other accounts then
reported customers to collection agencies when they failed to pay the imposed fees.  But because
the Affected Consumers did not open these accounts in the first place, they had no notice of
owing such fees and no reason to believe that any charges had been incurred, much less that
these charges would be turned over to collection agencies.  .

46.      Each time Fifth Third or its employees opened a credit card in an Affected
Customer's name, or enrolled an Affected Customer in Early Access without consent, the Bank
violated the Affected Customer's right to control his or her own credit.

47.     Each credit card or Early Access account opened in a customer's name initiated
an unauthorized credit inquiry negatively impacting the Affected Customer's credit score.

48.     Each time Fifth Third opened a demand account without the consent of an
Affected Customer in whose name the account was opened and/or charged fees on such
accounts, Fifth Third engaged in an unconscionable practice and deception and/or an omission of
a material fact constituting violations of the CPSA.

49.     The Unauthorized Account Fraud is pernicious.  While some Affected Customers
like Plaintiff Michael Hartt discover that an unauthorized account had been opened in their name
because they receive an unauthorized card or paperwork in the mail, many Affected Customers
remain unaware that unauthorized accounts have been opened in their names. This is because the
Bank often does not send statements or other information related to the unauthorized account to

Affected Customers, which allows bank employees to generate points for a new account while not tipping off the Affected Consumers.

**Fifth Third and Its Management Made False and Misleading Statements About the Bank's Policies while the Unauthorized Account Fraud was Ongoing**

**Fifth Third's Marketing Communications about how accounts were opened**

50.     Throughout the relevant time, Fifth Third's Marketing materials informed consumers that they had authority and control over whether any Fifth Third products were opened in their name.

51.     For example, Fifth Third Marketing materials informed that Bank accounts were opened only upon customer application, in person or online.[18]



52.     Likewise, Fifth Third marketing materials communicated that credit cards were only issued after a customer had selected to open a credit card.[19]  For example,

---

[18] https://web.archive.org/web/20200215020200/https://www.53.com/content/fifth-third/en/personal-banking/bank/checking-accounts/essential.html
[19] https://www.53.com/content/fifth-third/en/personal-banking/resource-center/money-management/compare-credit-card.html



53.     In addition, Fifth Third stated that Early Access enrollment could only occur after

a customer applied for such an account in person at a Branch.[20]

### How do I apply for Fifth Third Early Access?

Customers who meet the eligibility requirements can enroll in Fifth Third Early Access at any Fifth Third Banking Center location.  New checking and Express Banking customers must wait one (1) year before enrolling.

Review the Early Access Terms & Conditions for more information about eligilbility and availability.

54.     Fifth Third Marketing materials also informed that customers could control

whether to enroll in online banking services:

### Online Banking

**We've made online banking faster and more efficient.**

Managing your money is now easier than ever. From sending and receiving money to checking your balance, our online banking is quick and simple.

**MORE DETAILS**   Get Started

55.     Each of the Bank's statements about the way Fifth Third opened customer

accounts were deceptive because they indicated that Fifth Third only opened bank accounts,

provided credit products, and enrolled customers in online banking services after a customer took

affirmative steps to authorize the opening of these accounts and services.  As set forth above,

Fifth Third employees routinely enrolled customers in all of these services even though such

customers did not apply for such services, and never authorized them.

---

[20] https://www.53.com/content/fifth-third/en/personal-banking/bank/early-access.html

**Fifth Third's Affirmative Statements About The Bank's Corporate Conduct and Risk Management**

56.     Since 2008, Fifth Third and its executives have issued numerous deceptive statements assuring its customers and the public that it had policies and procedures in place to protect the privacy, integrity and security of customers' personal information and funds, and that such protections were of central importance to the Bank's overall mission.

57.     For example, in March 2019, CEO Carmichael stated, in accepting an award for Corporate ethics, that the Company had "strong governance, risk awareness and risk management, as well as [an] enhanced focus on culture and integrity.[21]

58.     The Code of Business Conduct and Ethics that Fifth Third filed publicly with the SEC promised that Fifth Third employees would "not take unfair advantage of anyone through manipulation, concealment, abuse of privilege or confidential information, misrepresentations fraudulent behavior or any other unfair dealing practice."[22]

59.     The Code of Conduct also assured that no employee would use illegal or unethical means or methods when acting on behalf of Fifth Third."[23]

60.     All of the above referenced Fifth Third statements about the Bank's practices, conduct and risk management were false, because the Unauthorized Account Fraud was the result of poor corporate governance and risk management and constituted unfair, unethical and illegal activity.

61.     Even after the Unauthorized Account Fraud was brought to light, Fifth Third continued to deny the truth: In a March 9, 2020 document released to the press, Fifth Third

---

[21] https://www.53.com/content/fifth-third/en/media-center/press-releases/2019/press-release-2019-02-26.html
[22] Fifth Third Bancorp Code of Business Conduct at p.5.
https://www.sec.gov/Archives/edgar/data/35527/000119312504218360/dex14.htm
[23] Id.

falsely stated that : (1) there was no evidence of systemic misconduct with respect to the

Unauthorized Accounts; and (2) denied that the bank imposed unrealistic sales goals incentivized

employees to open unauthorized accounts.  These statements were false.

**CLASS ACTION ALLEGATIONS**

62.     Plaintiff brings this matter on behalf of himself and all others similarly situated,

under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

63.     The class Plaintiff seeks to represent is defined as follows:

All persons in the United States for whom Fifth Third or a Fifth Third employee opened a

financial account or product in the person's name without that person's lawfully obtained

authorization.

64.     Numerosity/Impracticability of Joinder: The members of the Class are so

numerous that joinder of all members would be impractical. The proposed Class likely contains

thousands of members. The precise numbers of members can be ascertained through discovery,

which will include Defendants' sales and other records.

65.     Commonality and Predominance: There are common questions of law and fact

that predominate over any questions affecting only individual members of the Class.

66.     For Plaintiff and the Class, the common legal and factual questions include, but

are not limited to, the following:

   a.   Whether and how Fifth Third and its employees engaged in unlawful practices in

        order to get each customer to maintain numerous accounts with Fifth Third;

   b.   Whether Fifth Third made misstatements and omitted and concealed material

        facts from its communications and disclosures to Plaintiff and the Class regarding

the costs, benefits, and policies regarding bank accounts and other financial products;

c.   Whether Fifth Third has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with the sale of its financial products;

d.   Whether Fifth Third violated the Ohio Consumer Sales Practices Act;

e.   Whether Fifth Third violated the Federal statutes enumerated in the causes of action below;

f.   Whether Fifth Third has been unjustly enriched or is liable for conversion;

g.   Whether, as a result of Fifth Third's conduct, Plaintiff and the Class have suffered damages; and if so, the appropriate amount thereof; and

h.   Whether as a result of Fifth Third's misconduct, Plaintiff and the Class are entitled to equitable and declaratory relief, and if so, the nature of such relief.

67.   **Typicality:** The representative Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all the members of the Class have been injured by the same wrongful conduct by Fifth Third.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories

68.   **Adequacy:** Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiff nor his attorney have any interests contrary to, or in conflict with the Class.

69. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this action, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual members of the Class do not have a significant interest individually controlling the prosecution of separate actions, and individualized litigation would also result in varying inconsistent , or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Fifth Third has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief for the Class as a whole is appropriate.

70. Plaintiff does not anticipate any difficulty in the management of this litigation.

71. Fifth Third has, or has access to, address and/or contact information for the members of the Class which may be used for the purpose of providing notice of the pendency of this action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT

**(R.C. §§ 1345.01, et seq.)**

72.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated herein.

73.     Plaintiff Michael Hartt and the Class are "consumers" within the meaning of Ohio Revised Code § 1345.01(A).

74.     Defendant is a "supplier" within the meaning of Ohio Revised Code § 1345.01(C).

75.     Plaintiff Michael Hartt, the Class and Defendant all engaged in a "consumer transaction" within the meaning of Ohio Revised Code § 1345.01(D).

76.     The Ohio Consumer Sales Practices Act ("CSPA") makes it unlawful for suppliers to "commit an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Revised Code § 1345.02 *et seq.*

77.     Defendant violated the CSPA by:

   a.    wrongfully opening accounts without customer authorization,

   b.    accessing customer credit histories without authorization, and charging customers fees and penalties related to accounts that were opened without the consent, knowledge or authorization of Plaintiff and the Class.

   c.    knowingly making misleading statements and representations which informed that the opening of any banking accounts, credit cards, and enrollment in banking services was accomplished by a consumer applying and authorizing such opening and/or enrollment. Fifth Third knew that Plaintiff and the Class would likely rely upon such statements in deciding whether to bank with Fifth Third. R.C.§1345.03(6).

      d.   willfully failed to disclose the Unauthorized Account fraud. Accordingly,

Defendant engaged in unfair and deceptive acts or practices and unconscionable

acts or practices.

78.    Fifth Third's actions are also unlawful because, inter alia, they violate the Truth in

Savings Act ("TISA").

79.    TISA requires banks to make clear and uniform disclosures of interest rates and

fees associated with deposit accounts. 12 U.S.C. §4301.

80.    TISA mandates that before an account is opened or a service is rendered" the

financial institution must provide the potential customer with a schedule of interest rates and fees

applicable to the account or service. 12 U.S.C. §4305.

81.    When Fifth Third opens accounts and commences services without customer

authorization, it does not provide customers with the required schedules of interest rates and fees

applicable to those accounts in violation of TISA.

82.    Plaintiff Michael Hartt and the Class have suffered actual damages and

ascertainable loss as a direct and proximate result of Fifth Third's violations of the CSPA,

including but not limited to fees and charges imposed on unauthorized accounts, negative credit

reports, and unauthorized access of personal financial information.

83.    Pursuant to Ohio Revised Code § 1345.09 for each violation of the CSPA,

Plaintiff Michael Hartt and the Class seek actual damages resulting from each violation, plus an

amount not exceeding five thousand dollars in noneconomic damages, together with equitable

relief as determined by the Court to be proper.  Specifically, Plaintiff and the Class seek to enjoin

Fifth Third from further unfair or deceptive acts or practices; order Fifth Third to return all

amounts that Plaintiff and the Class were charged as a result of the unauthorized accounts; to

award attorney's fees and costs against the Defendant; to assess punitive damages as the Court

finds just and proper to punish Defendant for its willful intentional and malicious plans to

deceive defraud and injure Plaintiff and the Class; and to order any other just and proper relief

available under the CSPA.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF TRUTH IN LENDING ACT (TILA)
## (15 U.S.C. § 1642 AND REGULATION Z)

84.     Plaintiff incorporates by reference every prior and subsequent allegation of this

Complaint as if fully restated herein.

85.     Under TILA, "no credit card shall be issued except in response to a  request or

application therefor." 15 U.S.C. § 1642.  Regulation Z requires that  "regardless of the purpose for

which a credit card is to be used, including business, commercial, or agricultural use, no credit

card shall be issued to any person except in response to an oral or written request or application

for the card; or as a renewal of,  or substitute for, an accepted credit card." 12 C.F.R. § 1026.12(a).

86.     Fifth Third issued credit cards to consumers without their knowledge or  consent

and not in response to an oral or written request or application for the card.

87.     Therefore, Fifth Third violated TILA and Regulation Z.

## THIRD CAUSE OF ACTION
## THE FAIR CREDIT REPORTING ACT (FCRA)
## (15 U.S.C. § 1681, *et seq.*)

88.     Plaintiff incorporates by reference every prior and subsequent allegation of this

Complaint as if fully restated herein.

89.     Each time Fifth Third opens a new account or provides a new financial service, it obtains, reviews, and uses a "consumer report" as that term is defined in 15 U.S.C. §1681a(d) about the customer for whom the account is opened or the service started.

90.     Fifth Third is required by 15 U.S.C. §§ 1681b, 1681n, and 1681o to refrain from obtaining or using consumer reports for Credit Rating Agencies under false pretenses, and without proper authorization from the consumer who is the subject of the report.

91.     Obtaining and using consumer reports in the process of opening unauthorized accounts or services is not allowed under FRCA, and, is thus a violation of Federal Law.

92.     Fifth Third has a mandatory duty to use or obtain consumer credit reports only for permissible purposes. 15 U.S.C. §1681b(f).

93.     Despite the clear and unambiguous requirements of the FCRA, Fifth Third regularly pulls consumer reports without such customer knowledge or consent in order to open new unauthorized accounts in violation of FCRA.

94.     Pursuant to 15 U.S.C. §§1681n and 1681o, Fifth Third is liable for negligently and willfully violating FCRA each time it accesses consumer credit reports including those of Plaintiff and other Class members without a permissible purpose or authorization under FCRA.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF ELECTRONIC FUNDS TRANSFER ACT
### (15 U.S.C. § 1693, *et seq.*)

95.     Plaintiff incorporates by reference every previous prior and subsequent allegation of this Complaint as if fully restated here.

96.     Congress created the Electronic Funds Transfers Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, in order to establish a framework to regulate electronic fund and remittance transfer systems, and to   establish individual consumer rights related to electronic fund transfers.

97.     Pursuant to the EFTA, "No person may issue to a consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than—(1) in response to a request or application therefor; or (2) as a renewal of, or in substitution for, an accepted card, code, or other means of access, whether issued by the initial issuer or a successor."     15 U.S.C.A. § 1693i(a).

98.     Fifth Third has violated and continues to violate this prohibition every time it opens new unauthorized accounts, issues credit cards, enrolls customers in online banking and Early Access programs and facilitates other means of access to the unauthorized accounts allowing for electronic funds transfers without customer request or approval.

99.     Plaintiff and Class members have had accounts opened in their names, received credit cards, and have been enrolled in online banking and Early Access despite the fact that Plaintiff and Class members have not requested or applied to Fifth Third for such services.

100.     Pursuant to 15 U.S.C. § 1693m, Fifth Third is liable for actual damages, an amount to be determined by the Court related to the frequency, persistence, and other factors of Defendants' violations, plus attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

101.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

102.     As a result of Defendant's unlawful and deceptive actions described above, Defendant was enriched at the expense of Plaintiff and the Class through the payment of fees, penalties, and other charges resulting from accounts products and services that Fifth Third

unlawfully and/or deceptively provided or "sold" to customers without their knowledge or consent.

103.     Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten gains they have received from Plaintiff and the Class in light of the fact that Fifth Third used illegal, deceptive and/or unfair practices to induce or force customers to open, purchase, and/or maintain the banking services accounts and products. Thus, it would unjust and inequitable for Fifth Third to retain the benefit without restitution to Plaintiff and the Class for the monies paid to Defendant as a result of the unfair, deceptive, and/or illegal practices.

**SIXTH CAUSE OF ACTION**
**DECLARATORY RELIEF**

104.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated herein.

105.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

106.     As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiff and the Class.

107.     Plaintiff and the Class therefore seek an order declaring Fifth Third's practice of opening unauthorized accounts unlawful, and that Fifth Third is liable to Plaintiff and the Class for damages caused by that practice.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, requests judgments against Defendant as follows:

A.     For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiff as representative of the Class and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

B.     Declaring Fifth Third's actions to be unlawful;

C.     Permanently enjoining Fifth Third from performing further unfair and unlawful acts as alleged herein;

D.     For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.     Granting Plaintiff and the Class awards of restitution and/or disgorgement of Fifth Third's profits from its unfair and unlawful practices described above;

F.     For costs;

G.     For both pre-judgment and post-judgment interest on any amounts awarded;

H.     For appropriate injunctive relief, including public injunctive relief, *i.e.* an order compelling Fifth Third to correct its nationwide policies that promote and condone the opening of unauthorized accounts;

I.     For treble damages insofar as they are allowed by applicable law

J.     For appropriate individual relief as requested above;

K.     For payment of attorneys' fees and expert fees as may be allowable under

applicable law and for such other and further relief, including declaratory relief, as the Court may deem proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 14, 2020

Respectfully submitted,

*/s/ Alyson Beridon*
Alyson Beridon (0087496)
BRANSTETTER, STRANCH & JENNINGS, PLLC
425 Walnut St., Suite 2315
Cincinnati, OH 45212
Phone: (513) 381-2224
alysonb@bsjfirm.com

J. Gerard Stranch, IV* (TN BPR #23045)
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Ave. Suite 200
Nashville TN 37203
Phone: (615) 254-8801
gerards@bsjfirm.com

Elaine S. Kusel* (NY Bar # 2654754)
MCCUNE WRIGHT AREVALO LLP
One Gateway Center
Suite 2600
Newark, NJ 07102
Phone: (908) 285-6802
esk@mccunewright.com

Richard D. McCune* (CA State Bar # 132124)
MCCUNE WRIGHT AREVALO LLP
18565 Jamboree Road, Suite 550
Irvine, California 92612
Phone: (909) 557-1250
rdm@mccunewright.com

Eric B. Abramson* (MI Bar No. P-60949)
Philip J. Goodman, Of Counsel (MI Bar No. P-14168)
SERLING & ABRAMSON, P. C.

280 N. Old Woodward Ave., Suite 406
Birmingham, MI 48009
Phone: (248) 647-6966
eabramson@serlinglaw.com
pjgoodman1@aol.com

*Counsel for Plaintiff and Proposed Class*

 **pro hac vice* forthcoming